Our first case for today is 2025-10526 Desiree Monique Mata v. Eric Guerrero. We'll hear first from Ms. Clayton. May it please the court. My name is Allison Clayton. I'm the deputy director of the Innocence Project of Texas and the professor of the Innocence Clinic at Texas Tech School of Law. I represent the petitioner appellate Desiree Mata. Could you move the microphone a little bit closer to you just so we can hear it? Yes, we just need to hear you a little bit better. Well I certainly want you to hear me so thank you for that. Thank you. This case presents a narrow but fundamental and well-established due process violation. A jailhouse informant was the only person placing Mata at the scene of the crime at the time of the for her testimony but that was a lie. And when she said that lie the prosecutor who solicited it knew that it was a lie but he did not correct it and in fact he repeated it doubling down on it in his closing statements. This is a clear violation of Mata's due process rights. This appeal asks whether under 28 U.S.C. section 2254 D1 the courts below reasonably applied clearly established law when denying Mata's NAPU and Brady claims. Now normally I like to jump right into the legal issues but in the briefing of this case there have been a few factual issues that have been muddied that we need to discuss head-on. There's two of these issues. The first one's regarding the letters and the second one is regarding the importance of this jailhouse informant's testimony. So let's first look at the letters. Opposing Counsel has offered a demonstrative exhibit and actually it's very helpful. Now there are a few points of clarification we're going to make with it but overall this is a very helpful exhibit. This indicates that there are ten letters that we have at play. There's actually more than ten but there are ten letters that's correct. If you look at these, so it's three pages long, going into trial the defense had it appears to be three letters based on cross-examinations. First is letter number three, second is letter number four and third is letter number eight. These are the three letters defense counsel had going into trial. Now letters three and four are from the jailhouse informant, her name is Brown. It's from Brown and from Brown's attorney to the prosecutor in the case saying hey we want a reduction and then letter number eight is from Brown to the Texas Ranger on the case saying hey please do what you agreed to help me. There's not a lot of additional clarification on that but that's what the letter says. So these are the three letters that they have going into trial. Now then, if you keep on going down there, trial is in between letters eight and nine. Trial is in January of 2015. Aren't there five letters not discussed at trial? Yes that's exactly correct, at least five letters. So in these five letters, letters one, two, five, six, seven, these are the pre-trial letters, the five pre-trial letters that we did not have and these paint a completely different picture as to what was going on. The letters that were disclosed indicate that Brown was hoping for a reduction but the letters that came after trial showed that this was an ongoing coordinated effort between Brown and her side involving Texas Rangers and involving the US attorney in Brown's case. Specifically let's first look at letter number five in October of 2013, so this is a little bit more than a year before Motta's trial. Brown wrote to her, the prosecutor, in her federal case and she said listen I want to rule 35 reduction. I'm enclosing letters multiple, multiple on that, letters from the Texas Ranger and I'm giving you the affidavit that I made. Now then, the letters that were from the Texas Ranger that Brown is referencing a couple of times in the undisclosed letters, to this day we do not have those letters. There's also an email that's in the undisclosed letter that's referenced from Riles, from Brown's attorney, to this Texas Ranger. We don't have that either. So we know that there are at least five but also several more, well at least two more letters and one more email that we have not, we still do not have. Were the undisclosed letters material? Yes. Can you go get into that? Absolutely. If you look at this letter that Brown sends in October to the AUSA and she says hey here's my affidavit, here's some letters from the Texas Ranger, and then you put the next letter, which we did not have, from the AUSA to Brown and he says I have this, this is not enough, if you want our sentence reduction you're going to need more. Two days later in another letter, Brown writes to the Texas Ranger on the case and that's the letter that we have that says please do what you agreed to help me do. So when you put all of these letters in into context, you have Brown saying I want the sentence reduction, her prosecutor saying you need more, and then you have her offering more. What was that? And she offered more. Yes. And it could be argued to the jury if the defense lawyer had known that she was bolstering because she was trying to get something. That she was clearly trying to get something. But the defense counsel knew this based on the three letters that the defense counsel had, right? I mean in other words she was impeached on this, but not very strenuously. The defense counsel knew that she hoped for something, but this is something entirely different. But you also had Brown's counsel, Bryles, testify, no she's given the statement freely, she's not doing it based on any sort of deal or anything like that. Is that just false? I don't want to impugn an officer of the court, but that is not accurate. Not accurate, but is it false? Yes, that's false. That was false. Whenever she was testifying, she was testifying because that's what she had to do to get her deal. No, I'm talking about the attorney. The attorney. The attorney says that her client... Yes, that was... I don't want to say that that was false because I don't know what she knew, I don't know, we don't, it's not clear exactly what point her... Well, and then the other thing is that the actual prosecutor asked Brown, have I promised you any deal? It was personal to, and Brown said, no you haven't, I haven't talked to you. That's literally true, isn't it? That is literally true, but it doesn't matter. But see here, it does matter because what we're here under is the AEDPA standard. This is a state court, the Texas Court of Criminal Appeals, has to have so gone off the rails in applying this law that no reasonable jurist, no fair-minded jurist would agree with the TCCA, right? Yes. Well, if it's literally true what the witness said and there was not a follow-up question, did anybody else get you a deal? The defendants counseled I don't think asked that question either. In other words, this could have easily come out. It wasn't asked and fleshed out and so we've got to basically say that despite those ideas, most favorably to the verdict, right, that the TCCA still could not have found as they did, could not have upheld the conviction. I have two responses to that question, Your Honor. Well, focus on AEDPA because that's the standard of review. Of course. The court recognized in Tassin v. Cain, which is an AEDPA case, and in that case, this court said that Giglio and Naipoo set a clear precedent that the crux of the Fourth Amendment violation is deception. That you don't have to have an explicit guarantee. You don't have to have an explicit process, a promise. A promise is not required. Deception is what matters and it doesn't have to be direct and that wasn't a first-time thing from this court in Tassin. That was established way back in Giglio. That was established in Bagley. This is very well established. Deception because it's part of a trial team and it's imputed to the prosecutor by the toll team. How do we get that there's actual deception here? That's actually a somewhat friendly question. Can we consider what other people knew in deciding whether or not the prosecutor participated in deception? Yes, the court's to look at the record as a whole and look at this. In this case, they flew in an attorney from Alabama to get on the stand and say my client, as far as I know, she's not expecting anything on this. That is a deception. These trick questions, do you expect anything from me? Expecting a rural county jury to understand who can and cannot grant her any kind of deals? Who was in on it? The prosecutor is in on it. I don't know for sure whether the defense attorney is in on it, but for sure the prosecutor and the witness are in on this deal. And that's clear from the letters. But also, does the prosecutor have a duty to correct the testimony of the witness or to not offer it or to ask for something from the judge when this testimony was given? Undeniably. That's established in NAPU. NAPU is very clear in saying that whenever something false comes out of the witness stand and the prosecutor knows it, he cannot elicit it and if it happens he has to correct it. That's long term. So you're arguing the testimony was literally false or just misleading by omission? Both. So if you look at the testimony, there's a couple of points that really matter. Whenever on cross of Brown the defense attorney says you got a case, he essentially says, you got a case against you and you were going to do some ear hustling to help yourself out. And she says no, that is a prosecutor on direct saying, here's your affidavit, read us your affidavit, and that affidavit starts out, I've not been made any promises in exchange for this testimony. Those are false statements. But again, it doesn't have to be a directly false statement. The hallmark of a 14th Amendment violation is deception. But it has to be material. It does. And it has to be, for AEDPA, beyond debate, material. Every reasonable jurist, every fair-minded jurist would have found that this was material. If that's not true, we uphold the TCCA's determination. Let me take a step back on that. We do have to look at it from the reasonable jurist perspective. But that standard, like a beyond all reasonable doubt, the Supreme Court did away with that a very long time ago. Well the Supreme Court just handed down a case that summarily reversed the Fourth Circuit on a NAPU or Brady claim that was fairly strong, fairly compelling, and the Supreme Court said, no, look at AEDPA's standard of review. So the admonition's fresh in my mind as to what the Supreme Court has said to do on AEDPA. Certainly. But you also have to remember, what we're dealing with here is a NAPU violation, and the standard of review on NAPU, on a NAPU violation, is, is there any reasonable likelihood? So it's not beyond all reasonable doubt. And in fact, in a lot of these cases... Well, it's a, but it's a NAPU violation that we're looking at, we're looking at the Texas Court of Criminal Appeals determination that it wasn't material, or that it wasn't false. In other words, if there's any way to uphold the Texas Court of Criminal Appeals, we basically have to do that. And, and she was asked, did you ask him, did you get an assistance or any promises for anybody? She says, not him, pointing to the prosecutor. Defense counsel never follows up. The follow-up question is, well did anybody do this? But that wasn't asked, was it? In this case, she lied. Whenever the defense attorney asked... No, I'm talking about the counsel that was crossing Brown. Asks, did anybody give you anything? I mean, correct me if I've got the record wrong, but she says, not him. And she's referencing the prosecutor in the case. The defense counsel, at that point, never asks the follow-up, did anybody else do it? Or did it, did they? Your Honor, that's wrong. He said, you, you were doing some ear hustling because you've just gotten a federal sentence, and she said, no. She didn't say, no, not him. She said, no. Now then. And the, and was the affidavit impeached? No. And the affidavit was just offered? It was just offered, just read it into the record. That's right. And if you want to know just how material this is, I mean, if you go through the record, Andy Brown is literally the only person who puts Desmata on the scene of the crime. Every time you read the record for the law clerks in the audience, every time you're going through the record, look at any kind of exculpatory evidence and think, does this put Mata on the scene? Not just our law clerks read the materials, if that's what you're implying. I know that you all read all of them. We don't appreciate that. Oh, I'm so sorry. I didn't mean that. I didn't mean it like that. But whenever you're going through the record, then, look, every time you get exculpatory information, exculpatory evidence, think, does this put her on the scene? And you won't find anything that puts her on the scene until you get to Angie Brown's testimony. Let's take about from the very knock on the door that started the entire thing. Co-defendant Juan Castillo said it was Desiree Reyna who knocked on the door. Whenever police showed him a lineup that had pictures of Desiree Reyna and Desiree Mata, he pointed to Desiree Reyna. He said it was Desiree Reyna. At trial, he got on the stand. He said it was Desiree Reyna. The person who says it was Mata is Angie Brown. She is material. But don't take my word for it. Just read what the prosecutor himself said was the import of her testimony in his letter to the AUSA, which you can find at page 2270 and 2271 of the record. And he details how this was a case with very little physical evidence, how they needed Angie Brown's testimony, how she played an important role in securing the conviction against Mata. So what the state now seeks to do is say, this was important enough of testimony to be able to take five years off of an armed career criminal's mandatory minimum sentence. And yet now it's not material enough to say that there's a reasonable likelihood. What do you say to the, how do you distinguish the Supreme Court's opinion in the Fourth Circuit situation recently? You have to go back to, so materiality is always a factual, a highly fact-specific inquiry. And you have to remember in this case, we have something that none of the other cases have, which is that letter in the Rule 35 motion, right? And that wasn't even considered by the district court below. We have proof of materiality admitted by this, by the very prosecutor who prosecuted the case. So that's how I distinguish it. We have much more evidence in this case of how important her testimony was. Can you point us to a case where the Supreme Court found a NAEPU violation without a Brady disclosure issue? There are a few. Normally they run part and parcel of each other, but in Glossop, no there was a Brady issue in Glossop. I'm not sure that there are, but I mean I know that they're out there, that they exist. But you think this has a Brady issue? Oh it does have a Brady issue. Yeah, I mean the disclosure issue with the other letters and that's, so that's how you get there. Yes, that's correct. Thank you. Thank you. We'll hear from Ms. Harp. May it please the Court. Mata fails to show that any of the letters she cites to were suppressed. She also fails to show that the informant attorney's testimonies were false when they truthfully testified that the prosecution had not communicated with either of them regarding a deal. And lastly, Mata fails to show that the letters or the testimony were material when evidence outside of the informant's testimony linked Mata to the murders. What is that evidence? The three largest pieces of evidence are Mata's co-defendant, Juan Castillo, confessed to the crime and said Roley's Desiree was involved. And then a letter written to Mata was found in his jail cell in which he tells her to tell the police that he was never at the scene of the crime. What Desiree? So he continually said Roley's Desiree and in a lineup he did point to Desiree Reyna. However, she was incarcerated at the time that these murders took place. All right, so she had an alibi but she was still misidentified. Yes, Your Honor. What evidence ties the right Desiree to the scene of the crime? The letter she wrote to him in prison or they found on him in prison or what? Yes, Your Honor. As well as the day before the victims were found murdered, she told her boyfriend in a recorded phone call, I do not give a damn about the money, that was my diamond, people die over diamonds. She literally said that the night before these victims were found. She then told her boyfriend that the victim was getting ready to move to Oklahoma and so she would never see any of the money that was owed to her. She had obviously, or excuse me, she had previously robbed one of the victims and had tampered with the same security system that was found tampered with after these victims were found murdered. So she fails to show that the record does not reflect that informants Brown's testimony was material. Okay, I'm sorry, what was the the whole universe of other evidence that ties her? Can you can you state that again because the Desiree thing is a little iffy. Yes, Your Honor. What else do you have that is concrete evidence that this the right Desiree ties to it? Just list out the things, just one by one. Sure, Your Honor. Evidence linking Mada to the crime. So if you will bear with me, I have seven different pieces of evidence. Good, let's hear it. They found two letters written to Alan, the victim, and Mada by her boyfriend at Alan's house after the murder where he tells Alan to give Mada $10,000. So that had to have been the missing money that she was speaking about in the reported phone call previous to the victims being found murdered. How does that establish that she was present at the thing? It gives her motive, Your Honor. She was on a list of people that the victim said had wronged him, including notes saying that she previously robbed his house. List of wrongs. Okay, this is motive again. This is not actually linking her to being at the scene. Correct, Your Honor. The only person who links her to be at the scene is this Ms. Brown, isn't it? And Rolly Cantu, Your Honor, or not Rolly Cantu, I apologize, Juan Castillo, her co-defendant. He said Rolly's Desiree, and then he wrote her a letter saying I was in there. You just said it was the wrong Desiree. He picked the wrong Desiree out of a lineup, Your Honor, but he wrote a letter to the correct Desiree, the Desiree in this case. Okay, so that's the letter that the co-defendant wrote, the same co-defendant who said Rolly's Desiree. But all the rest is just motive that she got some monetary benefit, or sought a monetary benefit. And that she had previously robbed him, she had previously been linked to him. You know, she says once again, before the victims were found murdered, people die over diamonds. Okay, can you help us on the letters that were not, your Brady argument rests on the position that the letters were not suppressed. Yes, Your Honor. What about the five identified in Mata's reply brief not discussed at trial, April 18th, May 9th, October 28th, two letters in November 12th? Yes, Your Honor. So as you can see from the visual aid, we have listed these out by number, and all these letters can be divided into five separate categories. As opposing counsel has previously stated, letters three, four, and eight were testified to. Letters number one and two were between the informant and her attorney. So it was highly unlikely the state had these in its possession, and nothing in the record reflects that the state suppressed them. Letters number five and seven were written to an assistant U.S. attorney who was not part of the prosecution team for Mata's case, and he represents an entirely separate sovereign. And so it's also unlikely that the prosecution had this, these letters. Letter number six. Did the prosecution have it? Do we know? Don't, wouldn't you know? Nothing in the record reflects whether the prosecution had it or not, but it can be inferred since the prosecution did hand over letters number three, four, and eight, and it can also be inferred they also have handed over letter number six. The prosecution did provide everything that they had, Your Honor. Well, isn't that the question? Yes, Your Honor, it is the question, but the record has to reflect that something was suppressed, and one way that the record could show that is if trial counsel had stated that in his affidavit to the lower court. The only letter that trial counsel says he didn't have was levered during number three, which was indeed cited to by trial counsel during the trial, Your Honor. Trial counsel himself has never stated that he did not have these letters. Okay. So, but it's not just the trial counsel that's at issue, right? It's got to be the whole team, the trial team. We've extended these, this Brady, certainly the Brady side of the house, to the whole team, and you, it's imputed to the, to the prosecutorial team, not just the prosecutor themselves. Yes, Your Honor, and in this instance, the letters that were written to the prosecution team were handed over, but a letter written to a U.S. Attorney General in Alabama, who's not part of the prosecution team, has nothing to do with this case. That would not be imputed. He's a completely separate Yes, Your Honor, and we did hand over, it's in the record, that letter number eight was written to the Texas Ranger, was written to the trial transcript. Letter number six, nothing in the record reflects whether letter number six was or was not suppressed. However, it could be inferred that it was handed over if letter number eight was. How do you infer that? Your Honor, if we have five separate letters, or excuse me, three, four, eight, and then six, and there's number three and four and eight were handed over, there would be no reason for the state to suppress letter number six. Furthermore, letter number six is cumulative of letter number eight, and cumulative evidence cannot be Brady material. Is it really cumulative? It seems to be pretty desperate and more emphatic. Your Honor, she was begging in letter number eight as well, please do what you agreed to do to help me. Please do what you agreed to do. But you agreed to do, it's after, you gotta have her asking for the agreement, and then she's agreed. I don't think those are duplicative. Your Honor, from my letter, my reading of letter number eight, she was talking, perhaps, I honestly don't know I'm not going to speculate on what promise she was referring to. It's just not in the record. Okay, is your best argument that we should defer to the Texas Court of Criminal Appeals because, under AEDPA? Your Honor, that is a very strong argument, and that is the standard of review here. However, I think our best argument is these letters were not suppressed, and our best argument is that the testimony was not false. Well, it was false, and her affidavit was false, and it was offered without any kind of explanation that it was false, wasn't it? Her affidavit, Your Honor, can you please? Her declaration, this first statement where she says nobody gave me any promises. No, Your Honor, that is not false because nothing in the record shows that the prosecution ever communicated with either Brown or her attorney. All we have here, at best, is a bit of an informant begging for something, but nothing shows that anybody ever communicated back to her until after the trial, Your Honor. Isn't this case like Princess Lacaze? The Lacaze case, you familiar with that case? Is that Lacaze versus? That's a Fifth Circuit case that deals where we did find a violation and reversed, and it was based upon a promise. Oh, yes, Your Honor, so this case is different because the prosecutor gave a witness an assurance that his son would not be prosecuted. Her son would not be prosecuted. Right, and in this case, Your Honor, nothing shows that the prosecution ever said that to Brown. Nothing shows that the prosecution ever communicated to her. In Lacaze, yeah, there was communication from the prosecution to the informant. It was pretty thin in that case, about whether or not what was communicated versus what she was hoping and what she thought. Well, Your Honor, in this case, it's not thin at all. It just doesn't exist. There's nothing that shows the prosecution ever communicated with Brown or her attorney. Okay, can you talk to me, talk to us about your argument on NAPU materiality. It seems to me that it tends to collapse Brady and NAPU, and I think they're distinct. So can you discuss that and what your position is on that? Yes, Your Honor, so post-glossop, which was decided four years after this case was decided by the CCA, really does separate Brady and NAPU. However, pre-glossop, there had never been a Supreme Court case that discussed NAPU materiality without an accompanying Brady violation. And so, Your Honor, on page, I believe it's 27, we discuss Long. It's a, I believe, Seventh Circuit case, and they do an excellent job there with discussing that there is nothing for the courts to follow whenever it comes to Supreme Court precedent whenever there is a NAPU claim without an accompanying suppression issue. And so the circuits were split on that pre-glossop, and so when this was decided in 2021, there was there was nothing to guide the state courts on what the material, materiality standard under NAPU would be without an accompanying suppression. And so you're saying we can't use what the correct Supreme Court standard is? The glossop Supreme Court standard, Your Honor? No, Your Honor, because that was decided four years after this case, and under AEDPA, you have to look at what Supreme Court precedent was at the time that the CCA decided this case. And when this case was decided, glossop did not exist. Was it a change, or was it just a reflection of, was it actually a change? Your Honor, it is our position that the state court can't follow something that did not exist. And so I don't know if it changed or not, Your Honor, there's nothing to indicate that because it just didn't exist. You had no guidance as to what the law was? The best guidance we had was Kyle's and Bagley, and in both of those cases, there were also accompanying Brady violations, Your Honor. Jumping back to the undisclosed letters, however you characterize it, so what exactly did the jury know at trial about Brown's incentive to testify? Your Honor, I think that defense counsel's closing argument summarizes pretty well that the jury did know that the informant had written letters, had talked about, like, please do what you agree to do to help me, and that she was hoping to receive some type of benefit. The jury did know that she had been asking for some type of benefit. The testimony... And you don't think the undisclosed letters are qualitatively stronger, not merely cumulative, but qualitatively stronger in making that case? Your Honor, first off, we don't believe that any of these letters were not disclosed. Right. We don't believe that any of them were suppressed. And so everything that the prosecution team knew, defense necessarily knew. And so we can't hand over something that we don't have or that didn't exist at the time. Like, letters 9 and 10 didn't even exist until after the trial. Mata, as discussed, fails to show that the state elicited false testimony. Nothing in the record shows that the prosecution ever communicated with the informant or her attorney regarding any type of deal. Most informant and her attorney were unilaterally hoping and requesting assistance, but nothing, again, once again, shows that they were ever communicated with by the prosecution team. In fact, the assistant U.S. attorney sent her a letter after trial in which he states that he never promised her anything at all, and that's letter number 9. And once again, she fails to prove that Brown's testimony was material when other evidence independent of Brown's testimony does point to her involvement in the murder. And so... So does your position depend on saying the testimony was not false at all, or that any falsity was immaterial? It was not false at all, Your Honor. But insofar as you all would find that it is, it's still not material, Your Honor. So what about what David Martinez said? That Monk had a handshake agreement with Brown? Did he found out about that? Yes, Your Honor, he does say that. Mr. Martinez also says that he didn't have letter number 3, which he cited to during the trial. And I'm not going to speculate on whether that's true or not. Nothing in the record supports that statement. That Monk had a handshake agreement to assist Brown? There's nothing in the record to support that? No, Your Honor. Is Mr. Martinez's statement in the record to support that? Your Honor, I'm not going to speculate on the truthfulness of that affidavit, because once again, Martinez also said that letter number 3 was suppressed, and he didn't have letter number 3 during the trial. But that's some evidence that there was some agreement? Yes, Your Honor. In closing, the Court of Criminal Appeals could not have gone against Supreme Court precedent when it denied Mata's claims, because Mata does fail to show that any of these letters were suppressed, and she has failed to show that any of the testimony was false. At most, she was begging for a nothing shows that the prosecution communicated back to her. And if there are no more questions, we would ask that you affirm. Thank you. We have your argument. Thank you. Ms. Clayton, you still have time for rebuttal. If you look at pages 2 and then again on 17 onward, of the district court's opinion below, you'll see that the court found that there was suppression in this case. And this court can't reverse that decision unless there's clear error on that, unless it's implausible on the face of the record. And given Mr. Martinez's uncontradicted affidavit, that's what guides the court when it comes to the finding of fact regarding the suppression of letters. Now then, let's look at some other things that were discussed. Whenever we talk about Raleigh's deseret, remember that Raleigh himself took the stand at trial and testified. I dated Desiree Reyna. So once again, even if you look at Juan Castillo's confession, he never ever puts Desmata at the scene of the crime at the time of the crime. The only person who does that is Angie Brown. The part about diamonds and money, all of the things go to motive, which Judge Awadjoo pointed out. The prosecutor in Desmata's case also pointed that out whenever he was trying to persuade the prosecutor to give an armed career criminal less than the mandatory maximum to file that Rule 35 motion. Now then, you're fair-minded jurists. That is the standard that governs us under ACPA. We're not asking you to do anything other than what NAPU clearly set forth back in the 1950s, and that is to look at this and to see the jury was deceived. Now let's take a step back on this. All of this jurisprudence started back in the 1930s with this case called Mooney v. Houlihan. And Mooney says that a prosecutor cannot obtain a conviction based on a lie. From the Mooney case sprung two sibling cases. You have NAPU and you have Brady. NAPU is about what the prosecutor let the jury hear. Brady is about what the prosecutor didn't let the jury hear. And so questions about what the defense would have known, I mean, that goes to Brady, that goes to things like the second element of Brady, whether this was hidden from the defense. But the question will always be in NAPU cases, was the jury deceived? And remember, we have it in NAPU, we have it in Tassin, we have it in Glossop, we have it later on in the Weary case. It doesn't have to be a solid promise. Yes, you told me I would get you a deal. It doesn't have to be that. Deception is the hallmark of a 14th Amendment violation. This court said that in Tassin. And when it said that, it was relying upon a long and well-established history that starts with NAPU and goes forward from there. And so what is the best evidence that the prosecutorial team knew of these interactions with the Texas Ranger and that this was, that they were acquiescent in that? The letters. The undisclosed letters. You have to look at them not just individually, but in context with each other. Because they had the letters. How do you know they had the letters? Under Giglio, it's the rule of imputed knowledge, first and foremost. If there's letters from the Texas Rangers, then that's imputed to them. Why? Because isn't the Texas Rangers working hand in hand? Or how do you know that they're imputed to them? Because they're a state agency and Giglio imputes knowledge to state actors, to the prosecution. We also have that in Bagley as well. But we know that they had them because after that district attorney lost his re-election, the new district attorney and one of the other co-defendants' cases said, hey, here's all these letters. That's when we discovered them was at the trial of the fourth co-defendant. So that's how we know he had them, because he's the one who handed them over. And there's nothing in the record that contradicts the fact that these letters were in fact suppressed. And you know that there was a coordinated effort. Everybody seems so kind of hardwired for certitude in this case. The letters were undisclosed. No, they weren't. The testimony was false. No, it wasn't. And there are like zero shades of nuance or gray. Every side seems so adamant and categorical. I mean, you're not wrong. It's just an observation. You're right. That's an observation. But that's, I think, what the record supports. And at the end of the day, this Court, as the reasonable, fair-minded jurists looking at this, you can't look at something and say the state says that this is important, that her testimony was really important, played a very large role in obtaining Mata's conviction, and then say it wasn't important. There's no reasonable likelihood that it would have made a difference. That's not fair. You say it was very important, and on the other hand, it wasn't. And all you have to be is a fair-minded jurist to see that this is clearly established law. It goes back decades and decades. And what the Court was saying in Glossop was nothing new. What we're asking the Court to do today is nothing new. Accordingly, we ask the Court to reverse. Thank you. Thank you. We have your argument. We appreciate both arguments and the cases submitted. The next case